The judgment appealed from is correct and is therefore affirmed.

No. 2574

Second Circuit

———

L. R. & N. CO. v. J. L. MULLEN SAW MILL CO., INC., ET AL.

———

(May 22, 1928.   Opinion and Decree.)

———

(*Syllabus by the Court*)

1. **Louisiana Digest—Appeal—Par. 625; Evidence—Par. 52, 53.**
The burden is on the plaintiff to make out its case with reasonable certainty, and the finding of the trial court that it has failed to do so will not be disturbed on appeal unless manifestly erroneous.

Appeal from the First Judicial District Court, Parish of Caddo. Hon. E. P. Mills, Judge.

Action by Louisiana Railway and Navigation Company against J. L. Mullen Saw Mill Company, Inc., et al.

There was judgment for defendants and plaintiff appealed.

Judgment affirmed.

Wise, Randolph, Rendall and Freyer, of Shreveport, attorneys for plaintiff, appellant.

Barksdale, Bullock, Warren, Clark and Van Hook, of Shreveport, attorneys for defendants, appellees.

STATEMENT OF THE CASE.

REYNOLDS, J. Plaintiff, an operator of a railway, sues defendant, an operator of

a sawmill, for $1324.27 with legal interest thereon from December 21, 1921.

It alleges that it and defendant entered into a contract in writing whereby defendant agreed, in consideration of plaintiff hauling logs to defendant's mill at special rates, defendant would ship out over plaintiff's railway at the regular rates the finished product of such logs or pay plaintiff the difference between the special rate and the regular rate on the finished product of such logs not so shipped out.

And plaintiff alleges that defendant failed to ship out over its railway the finished product of the logs so shipped in and owed plaintiff the sum demanded under the contract.

The United States Fidelity & Guaranty Company of Maryland, as surety for the faithful performance of the contract by the J. L. Mullen Saw Mill Company, Inc., is made a co-defendant and judgment against it and J. L. Mullen Saw Mill Company, in solido, is asked.

Defendants filed exceptions of no right and no cause of action which were referred to the merits.

Thereupon defendants answered denying liability and alleging that the J. L. Mullen Saw Mill Company, Inc., had shipped out over plaintiff's railway 2,704,505 pounds of finished product and that this was greatly in excess of the percentage of logs shipped in to its mill that it was required to ship out over plaintiff's railway.

And defendants pleaded the prescription of two years under Act No. 223 of 1914 of the legislature of the state of Louisiana, and the prescription of three years of section 424 of the Act of Congress of February 28, 1920, as amended by Act of June 5, 1920.

And assuming the character of plaintiff in reconvention defendants alleged:

"That, on or about the 1st of May, 1921, the plaintiff company, whose records are thoroughly erroneous and incompetent, made demand on defendant J. L. Mullen Saw Mill Company, Inc., for additional freight charges, as alleged in plaintiff's petition, and that, without checking the records, defendant J. L. Mullen Saw Mill Company, Inc., at that time agreed, as a compromise settlement, to pay plaintiff two hundred ninety-one and 08-100 ($291.08) dollars, which amount was subsequently paid, as shown by statement attached to plaintiff's petition, with the understanding and agreement on the part of the plaintiff company that the remainder of the claims and demands herein sued for should be remitted and released. That said payments, aggregating $291.08, were made through error, based on the misrepresentations and erroneous records of plaintiff company, and that defendant J. L. Mullen Saw Mill Company, Inc., is entitled to demand and recover the same in reconvention."

And defendants prayed that plaintiff's demands be rejected and its suit dismissed and for judgment in reconvention in favor of the J. L. Mullen Saw Mill Company, Inc., and against the plaintiff in the sum of $291.08 with legal interest thereon from the date of payment of the different items making up said amount.

On these issues the case was tried and there was judgment in favor of the defendants and against the plaintiff rejecting the demands of plaintiff and dismissing its suit at its cost; and there was judgment in favor of plaintiff and against the defendant J. L. Mullen Saw Mill Company, Inc., rejecting its reconventional demand.

The plaintiff appealed, and the defendant, J. L. Mullen Saw Mill Company, Inc., has answered the appeal and prays for judgment in reconvention against the plaintiff as set forth in its reconventional demand.

## OPINION.

Plaintiff's demand presents only a question of fact, namely, did defendant, J. L. Mullen Saw Mill Company, Inc., ship out over plaintiff's railway the finished product of all logs shipped into its sawmill over plaintiff's railway.

Defendant, J. L. Mullen Saw Mill Company, Inc., had paid all freight bills presented to it by the plaintiff on account of haulage of logs shipped into and finished product shipped out of its mill over plaintiff's railway and supposed it owed plaintiff nothing on that account when plaintiff made demand on it for payment of further charges and defendant, J. L. Mullen Saw Mill Company, Inc., paid to it $291.08 "with the understanding and agreement," as alleged by defendant J. L. Mullen Saw Mill Company, Inc., "on the part of the plaintiff company that the remainder of the claims and demands herein sued for should be remitted and released."

Still later the plaintiff demanded of defendant J. L. Mullen Saw Mill Company, Inc., further freight charges alleged to be due in the amount of $1324.27, which it refused to pay and this suit followed.

On trial plaintiff's own witnesses virtually admitted that the charges made the basis of plaintiff's demand are erroneous.

One of plaintiff's witnesses, J. J. Tippin, testified:

"Q. Is that statement correct?
"A. Yes, sir, our statement is correct, with one exception. On statement 'C'—
"Q. I am not talking about statement 'B'; I am talking about statement 'A'; is that correct?
"A. Well, statement 'A' has six cars included in it that are included in statement 'C.' It is correct with that exception.
"Q. How did that arise?
"A. The Western Weighing and Inspection Bureau—

"Q. Was it their error?
"A. It was their error.

* * *

"Q. The document marked 'C,' have you got that before you?
"A. Yes.
"Q. What have you to say as to the correctness of that?
"A. It is correct, with the exception of six cars which are included in document 'C' and also included in document 'A'.
"Q. Leaving them in document 'A' then, that would be—they should be deducted from 'C'?
"A. Yes, sir.
"Q. Have you figured what that deduction would amount to?
"A. That deduction would amount to a net credit of one forty-nine naught three.
"Q. Did you discover that difference since the case was called?
"A. We discovered this error on November 12th.

* * *

"Q. Mr. Tippin, do you know anything about how much lumber was shipped out over your road by the defendant company during the time from October 1, 1919, to October 1, 1920?
"A. I don't know how much was shipped out over our line.
"Q. Do you know how much rough logs, rough material was shipped in to the defendant company over your line between October 1, 1919, and October 1, 1920?
"A. I do not.

* * *

"Q. When did you first check over these statements attached to the petition, Mr. Tippin?
"A. We prepared the statement marked exhibit 'C' on August 20, 1921; the total amount of that statement was five hundred and twelve dollars and sixteen cents. The Mullen Saw Mill Company acknowledged this statement—
"Q. Now I am not asking you about that. Just answer my question. I asked you when you first checked over this statement which you stated was correct?
"A. I checked that statement along in June—I believe it was August 20, 1921.
"Q. And you didn't catch that error?
"A. And statement marked 'C' was made and the statement marked 'A' was made later.
"Q. Answer my question, please, sir;

when did you discover this error?

"A. I discovered this error on November the 12th, 1923.

"Q. That was yesterday?

"A. Yes, sir.

\* \* \*

"Q. Who made that error?

"A. This error was made by four or five of us. The Bureau made it first and I made it second. I made it by not checking the statement back.

"Q. And this is the Bureau you pay to keep your records straight?

"A. That is the Bureau, yes, sir.

\* \* \*

"Q. Why was it that you didn't catch the duplication of these cars the first time you checked it?

"A. I can't tell you that.

"Q. If you checked it over carefully you would have caught that duplication, would you not? You would have caught a duplicate check on these cars, you made the statement?

"A. The statement was prepared under my instructions.

"Q. Well, you swore it was correct except for that error?

"A. It was prepared and I simply issued instructions to check this statement and give me a list of way bill references covering it.

"Q. Then you have never checked it yourself at all?

"A. No, sir, not personally; but it was checked under my instructions.

"Q. Well, then, you didn't discover the error yourself?

"A. I discovered it personally. I checked it yesterday, the car numbers in one statement against the other.

\* \* \*

"Q. You handled this settlement that you have been talking about, for the railroad?

"A. That was handled through the Bureau. I approved the collection arrangement of fifty dollars a month. The Bureau made the arrangements for the payments.

\* \* \*

"Q. Do you deny that the settlement that you had with Mr. Mullen had reference to the material or the shipments to Kelly-Mullen Lumber Company?

"A. Well, I don't know what they had reference to.

\* \* \*

"Q. Look at this statement I hand you with pages one and two attached, does that show the result?

"A. That shows the number of cars that were inbound without outbound shipment to apply against them. It shows the charges on the basis of the net rate or the amount paid and it shows the charges that should have been paid on the basis of the regular rate. The total amount being seven hundred and eighty-three dollars and fifty-eight cents. It also shows a credit of two hundred and ninety-one dollars and eight cents. That has already been paid by Mr. Mullen, leaving a balance of four hundred and ninety-two dollars and fifty cents, the amount of the claim as we figured it since checking over the yellow sheets.

"Q. How much less is that than you claimed the first time?

"A. The original claim was for one thousand three hundred and twenty-four dollars and thirty-seven cents, and the amount claimed is four hundred and ninety-two dollars and fifty cents.

"Q. As the result of what?

"A. Checking these yellow sheets and correcting the milling-in-transit record and preparing our statements accordingly.

"Q. So the Mullen Company is the gainer by your recheck by four hundred and eighty-one dollars and fifty cents, the difference?

"A. They are the gainer by the difference between one thousand three hundred and twenty-four dollars and thirty-seven cents and four hundred and ninety-two dollars and fifty cents."

The witness, Tippin, was the auditor of the plaintiff, Louisiana Railway & Navigation Company.

A. W. Hicks, travelling agent for the Western Weighing and Inspection Bureau, another witness for plaintiff, testified:

"Q. How do you get that application? Is it part of any written contract or agreement that you would not apply outbound shipments to subsequent inbound shipments? Is that included in any contract?

"A. I don't now that that is in the contract, but it is accepted by everybody as the correct practice. It is accepted by the Interstate Commerce Commission that a

credit cannot be given for a car in advance of the outbound movement.

\* \* \*

"Q. If there was shipped out over the line of the L. R. & N. company more lumber, in feet, than there were logs, in feet, which came in, there cannot be any question that all of the inbound stuff was reshipped or that an equal amount of other stuff was substituted for it, can there?

"A. Well, there can be in a certain way, yes, sir, that is, in a legal way.

\* \* \*

"Q. Now, have you checked the weight in and the weight out, or the weight in with the weight out, to show or find out what percentage in terms of weight were shipped out as compared with what was received in during the whole time?

"A. I did not, no, sir.

"Q. Have you checked the weight in with the weight out to find out the percentage of reshipments in proportion to the shipments of rough material in for the month in which you claim we are delinquent?

"A. No, sir.

"Q. Then you don't know nor don't pretend to know how far the Mullen Saw Mill Company falls short of having shipped out all of the inbound or the products of the inbound rough material during the time for which you sue, do you?

"A. I can only say I know that they were short in their reshipment for the individual cars on check that was made in order not to allow them to ship before the rough material came in.

"Q. Do—you don't now claim that they were short of total aggregate shipments, for the total aggregate time?

"A. Yes, they were.

"Q. How much?

"A. I couldn't say.

\* \* \*

"Q. Did your tariff give the shipper the right to substitute other lumber when it otherwise disposed of the lumber coming in?

"A. No, sir; no tariff gives that.

"Q. Have you ever read this tariff?

"A. I have, yes, but I don't recall that in there.

"Q. Please read into this record at this time this point that I indicate to you, first and second lines.

"A. 'In the event the manufactured product is less than the required percentage there should be added sufficient outbound—' "

Against this testimony offered on behalf of plaintiff Mr. V. M. Marr testified on behalf of defendants:

"Q. State what check you made, if any, of the inbound and outbond shipments in your capacity as traffic manager for this company.

"A. Why I checked up that inbound and outbound from the time they commenced operation until they closed.

"Q. What have you to say with reference to the comparative amount reckoned in terms of logs shipped into this Mullen mill and the lumber shipped out from the Mullen sawmill over the L. R. & N. Company between the 8th day of December, 1919, and the 16th day of April, 1921?

"A. Well, we shipped out a few thousand feet more than we got in.

\* \* \*

"Q. Did you make any condition with Mr. Hicks, at the time you were making this joint investigation, to settle this matter, did you make any contention with him that he was claiming too much for the railroad?

"A. I did.

"Q. As a matter of fact, don't you know that the investigation was made according to these pages here, and settlement or partial settlement was made \* \* \* didn't you tell Mr. Hicks you were going to say to Mr. Mullen that the railroad company's claim for this amount was correct?

"A. That is, on the settlement of fifty dollars a month?

"Q. Yes.

"A. At that time that was supposed to have settled it.

"Q. But didn't you say that?

"A. It was settled then at that time.

"Q. Yes, settled by you. Now then, all of these demands or claims were worked up after you and Mr. Hicks had separated, were they not?

"A. After we had settled, yes."

J. M. Mullen, president of the defendant sawmill company, testified:

"Q. To whom did you make that payment of $291.08 alleged to have been made?

"A. Well, I was told—

"Q. To whom, on behalf of the L. R. & N?

"A. I was told that that was a balance I owed.

"Q. To whom did you pay it?

"A. The railroad company.

* * *

"Q. Why was there not more finished product resulting from the manufacture of these logs that you got over the L. R. & N?

"A. Well, the worms had eaten them up and we couldn't get enough out of them to pay for putting them through the mill.

"Q. What did you do in the way of substituting other finished products in the place of these logs that were ruined and shipping it out over the L. R. & N?

"A. Well, we shipped out the logs that came in over the K. C. and the T. & P.; we shipped them out over the L. R. & N.

"Q. Did you not ship out over the L. R. & N. all of the merchantable manufactured products from the logs that came in over the L. R. & N?

"A. Yes, sir.

"Q. And more besides?

"A. And more besides.

* * *

"Q. Well, you are positive that you shipped out everything that you promised to ship out over the L. R. & N.; you are positive of that?

"A. Yes, sir; the traffic manager, Mr. Marr, handled that, though."

The testimony of plaintiff's witnesses and that of defendants' witnesses is conflicting, but the District Judge who heard them testify and observed their demeanor on the witness stand gave judgment in favor of the contention of the defendants, and we are unable to say that his finding is incorrect.

Defendant J. L. Mullen Saw Mill Company, Inc., claims in reconvention $291.08 paid by it to plaintiff, and alleged to have been paid by it in error. But defendants specifically allege that the payment was made "as a compromise settlement" of a larger amount claimed by plaintiff and for which defendants denied liability.

"* * * with the understanding and agreement on the part of the plaintiff company that the remainder of the claims and demands herein sued for should be remitted and released."

The District Judge disallowed the reconventional demand and under the evidence we are unable to say that the payment was made in error.

Finding no error in the judgment appealed from, it is ordered, adjudged and decreed that it be affirmed.